United States District Court
Southern District of New York

_____

In re BERNARD L. MADOFF,

                          Debtor,
                                              10 Civ. 4652 (JGK)
_____           10 Civ. 7101 (JGK)
ADELE FOX and SUSANNE STONE                    10 Civ. 7219 (JGK)
MARSHALL,                                      11 Civ. 1298 (JGK)
                                              11 Civ. 1328 (JGK)
                          Appellants,
               - against –                     OPINION AND ORDER
IRVING H. PICARD,

                          Appellee,
_____

SECURTIES INVESTOR PROTECTION
CORPORATION,

                          Intervenor.
_____

JOHN G. KOELTL, District Judge:

       These consolidated bankruptcy appeals arise out of the

multi-billion dollar Ponzi scheme orchestrated by Bernard L.

Madoff ("Madoff"), and the subsequent bankruptcy of Bernard L.

Madoff Investment Securities LLC ("BLMIS") in the wake of the

public revelation of that scheme.  The appellants Adele Fox and

Susanne Stone Marshall (collectively, the "Appellants") each

invested money in BLMIS.  After the bankruptcy proceedings

began, Fox and Marshall filed separate class action lawsuits in

the United State District Court for the Southern District of

Florida (the "Florida Actions"), asserting Florida state law

claims against Jeffrey Picower, an alleged Madoff co-

conspirator, and other related defendants (collectively, the

                              1

"Picower defendants").  The appellee, Irving H. Picard ("Picard" or the "Trustee"), is the trustee for the BLMIS estate pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa et seq.  Picard now has reached a settlement agreement with the Picower defendants under which they will repay $5 billion to the BLMIS estate.  In addition to the $5 billion, the Picower defendants agreed with the Government to forfeit approximately $2.2 billion.  The result of these agreements is that the Picower defendants will return the total amount of their net withdrawals from BLMIS for the benefit of the other customers of BLMIS.

The Appellants appeal the declaration of the Bankruptcy Court (Lifland, B.J.) that the Florida Actions were void at the outset because they were commenced in violation of the automatic stay order in this case, as well as a preliminary injunction issued by the Bankruptcy Court enjoining the Appellants from proceeding with the Florida Actions.  The Appellants also appeal the Bankruptcy Court's approval, in a later decision, of the settlement reached by Picard with the Picower defendants, and its issuance of a final injunction precluding the assertion of claims that were duplicative or derivative of claims brought by the Trustee, or that could have been brought by the Trustee, against the Picower defendants.

The Bankruptcy Court was plainly correct in finding that the Florida Actions violated the automatic stay and should be preliminarily enjoined. They were a transparent effort to pursue claims against the Picower defendants that were duplicative of claims brought by the Trustee and that belonged to the Trustee on behalf of all the creditors of BLMIS. Similarly, the Bankruptcy Court was correct in approving the settlement with the Picower defendants that was extraordinarily beneficial to the BLMIS estate, and in enjoining claims against the Picower defendants duplicative of those brought by or which could have been brought by the Trustee.

## I.

In December, 2008, Madoff was arrested and charged with criminal violations of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 in the United States District Court for the Southern District of New York in connection with a massive securities fraud scheme. Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC ("Automatic Stay Decision"), 429 B.R. 423, 426 (Bankr. S.D.N.Y. 2010). The SEC also filed a civil lawsuit against Madoff and BLMIS. Id.

On December 15, 2008, the District Court granted a motion by the Securities Investor Protection Corporation ("SIPC") to place those who had invested money with BLMIS ("BLMIS

customers") under the protection of SIPA and issued a Protective

Order.  Id.; see also Protective Order filed Dec. 15, 2008, (the

"Dec. 15 Protective Order"), Secs. Investor Prot. Corp. v.

Bernard L. Madoff Inv. Secs. LLC, Case No. 08-1789 (Bankr.

S.D.N.Y.), ECF No. 1.  Appellee Picard was appointed as the

trustee for the SIPA liquidation of BLMIS, and the liquidation

proceedings were transferred to the Bankruptcy Court.  Automatic

Stay Decision, 429 B.R. at 426.  Under SIPA, Picard has the

powers and duties of a bankruptcy trustee, and is charged with,

among other things, recovering the property of BLMIS's

customers, and distributing those assets.  See 15 U.S.C. §§

78fff-1(a)-(b).  On December 23, 2008, the Bankruptcy Court

entered an order setting forth the process by which BLMIS

customers could file claims with Picard, by which Picard would

determine those claims, and by which any objections to Picard's

determinations would be adjudicated.  See Automatic Stay

Decision, 429 B.R. at 426.  Fox and Marshall eventually filed

claims with the Trustee pursuant to that process.  The District

Court's December 15 Protective Order also invoked the automatic

stay provisions of 11 U.S.C. § 362(a), staying "any act to

obtain possession of property of the estate or property from the

estate."  Dec. 15 Protective Order at 2.

Under SIPA, "customers share pro rata in customer property"

recovered by the trustee "to the extent of their net equities."

4

Automatic Stay Decision, 429 B.R. at 427 (citing 15 U.S.C. §
78fff-2(c)(1)(B)); see also 15 U.S.C. § 78lll(11) (defining "Net
Equity").  In March, 2010, the Bankruptcy Court issued a
decision on the question of how BLMIS customers' net equity in
BLMIS would be determined.  The Bankruptcy Court "approv[ed] the
Trustee's method of calculating a customer's Net Equity as the
amount of cash deposited into the customer's BLMIS account, less
any amounts withdrawn from the customer's BLMIS account (the
'Net Investment Method')."  See Automatic Stay Decision, 429
B.R. at 427 (citing SIPC v. BLMIS (the "Net Equity Decision"),
424 B.R. 122, 135, 140 (Bankr. S.D.N.Y. 2010)).  As a result of
the Net Equity Decision, BLMIS customers who had withdrawn more
from their BLMIS accounts than their principal investments, so-
called "net winners," are not entitled to a share of the
property recovered by the Trustee until all "net losers" have
received back their principal investments.  The fact that
customers thought though they had profits that turned out to be
fictitious did not entitle them to those profits.  The Court of
Appeals for the Second Circuit subsequently affirmed the
Bankruptcy Court's Net Equity Decision.  See In re Bernard L.
Madoff Inv. Sec. LLC, 654 F.3d 229, 235 (2d Cir. 2011) ("Mr.
Picard's selection of the Net Investment Method was more
consistent with the statutory definition of 'net equity' than

any other method advocated by the parties or perceived by this Court.").

Appellant Marshall filed her claim with the Trustee in January 2009.  Picard allowed her claim in July, 2009, in the amount of $30,000, the amount of Marshall's initial deposit with BLMIS.  The final balance on Marshall's BLMIS account statement was $202,836.91.  Marshall received a payment of $30,000 from Picard in August, 2009.  Before receiving that payment, "Marshall executed an assignment and release of any claims against BLMIS or third parties for, inter alia, any illegal or fraudulent activity with respect to her BLMIS account that gave rise to her customer claim against BLMIS."  Automatic Stay Decision, 429 B.R. at 428.

Appellant Fox had two accounts with BLMIS, the final balances of which were $887,420 and $1,948,718 respectively. Id.  Fox does not contest that she does not have net equity in either account, having withdrawn amounts greater than her principal investment, and thus is barred by the terms of the Net Equity Decision from receiving payments through the liquidation until all BLMIS customers have received back their principal investments.  Fox filed claims with the Trustee, which were denied.  See Adele Fox's Objection to Trustee's Determination of Claim, Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC, Case No. 08-1789 (Bankr. S.D.N.Y. June 2, 2010), ECF

No. 2354, Ex. A (Determination of Claim); Adele Fox's Objection
to Trustee's Determination of Claim, Secs. Investor Prot. Corp.
v. Bernard L. Madoff Inv. Secs. LLC, Case No. 08-1789 (Bankr.
S.D.N.Y. Dec. 15, 2010), ECF No. 3498, Ex. A (Determination of
Claim).  Fox objected to those determinations.  She received no
payment from the Trustee.

     In May, 2009, as part of his efforts to recover funds for
the BLMIS estate, Picard filed an adversary proceeding against
the Picower defendants (the "New York Action") for, among other
things, fraudulent transfers and conveyances made by the Picower
defendants as part of their conspiracy with Madoff.  The Trustee
relied on 11 U.S.C. §§ 544, 547, 548, and 550, the New York
Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law §§ 270-
281, and other applicable law relating to turnover, accounting,
preferences and fraudulent conveyances.  See Complaint at ¶¶ 1-
5, Picard v. Picower, Case No. 09-1197 (Bankr. S.D.N.Y. May 12,
2009), ECF No. 1 ("Picard Compl.").  The complaint in the New
York Action sought to recover more than $6.7 billion from the
Picower defendants.  Picard then began settlement negotiations
with the Picower defendants.  Automatic Stay Decision, 429 B.R.
at 429.  Picard ultimately identified $7.2 billion in net
withdrawals from BLMIS by the Picower defendants.  See
Settlement Order dated January 13 ("Settlement Order"), Picard

v. Picower, Case No. 09-1197 (Bankr. S.D.N.Y. Jan. 13, 2011),
ECF NO. 43, Ex. A ("Settlement Agreement"), at 2.

On February 16, 2010, while those settlement negotiations
were ongoing, Fox filed a class action lawsuit against the
Picower defendants in the United States District Court for the
Southern District of Florida, alleging Florida state law claims
for, among other things, conversion, unjust enrichment,
conspiracy and state RICO violations.  See Amended Complaint at
¶ 4, Fox v. Picower, No. 10 Civ. 80252 (S.D. Fla. Mar. 15,
2010), ECF No. 5 (the "Fox Complaint"); see also Automatic Stay
Decision, 429 B.R. at 429.  The Fox class, according to Fox's
complaint, comprises "all persons or entities . . . who have not
received the net account value scheduled in their BLMIS accounts
as of the day before the . . . SIPA Liquidation."  Fox Complaint
¶ 74; Automatic Stay Decision, 429 B.R. at 429.  The next day
Marshall filed a class action lawsuit in the same court,
alleging the same claims against the Picower defendants.  The
Marshall class comprises "all SIPA Payees, but only with respect
to claims, or portions thereof, not assigned to the Trustee."
Automatic Stay Decision, 429 B.R. at 429.  It is undisputed that
the Fox and Marshall complaints are based on the same factual
allegations as Picard's complaint against the Picower
defendants, namely that the Picower defendants participated in a
Ponzi scheme with Madoff, and that they benefitted from it by

withdrawing billions of dollars that they knew belonged to other BLMIS investors.  The Fox and Marshall complaints allege damages "in the form of lost investment income and returns on their BLMIS investments, and tax payments made in connection with non-existent profits."  Id.  The Fox complaint also alleges damages premised on the class members' exposure to Picard's "clawback efforts."  Id.  The Fox and Marshall classes seek "compensatory damages, prejudgment interest, an equitable accounting and the imposition of a constructive trust, disgorgement of ill gotten gains or restitution, treble damages, and punitive damages." Id.  Both Fox and Marshall amended their Florida complaints on March 15, 2010.

On March 31, 2010, Picard commenced an action in the Bankruptcy Court to enjoin the Florida Actions.  Id. at 430. Picard sought a declaration that the Florida Actions were barred by the automatic stay provisions of 11 U.S.C § 362(a).  Picard also sought a preliminary injunction pursuant to 11 U.S.C. § 105(a), which allows courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  Picard sought to enjoin Fox and Marshall from further prosecuting the Florida Actions.

The Bankruptcy Court granted these applications on May 3, 2010.  The Bankruptcy Court held that the claims in the Florida Actions were covered by the automatic stay under § 362(a),

9

finding that, "the claims asserted in the Florida Actions seek
to redress a harm common to all BLMIS customer claimants and,
consistent with the purposes of the automatic stay, belong
exclusively to the Trustee." Automatic Stay Decision, 429 B.R.
at 432.  The Court also found that the Florida Actions violated
the part of the District Court's December 15 Protective Order
"declaring that 'all persons and entities are stayed, enjoined
and restrained from directly or indirectly . . . interfering
with any assets or property owned, controlled or in the
possession of BLMIS.'"  Id. at 433 (alterations omitted).  The
Bankruptcy Court held that the Florida actions were "void ab
initio" because they were commenced in violation of the
automatic stay.  Id. at 433-34 (citing In re Colonial Realty
Co., 980 F.2d 125, 137 (2d Cir. 1992)).  The Bankruptcy Court
also issued a preliminary injunction pursuant to § 105(a), "[t]o
the extent section 362(a) and the District Court Stay Orders do
not apply in their own right to stay the Florida Actions,"
finding that the Florida Actions threatened the BLMIS estate,
and the Bankruptcy Court's jurisdiction over its administration.
Id. at 434.  Fox and Marshall appeal this order.

In August, 2010, the Bankruptcy Court issued a "Striking
Order," which struck from the Appellants' statements of issues
to be presented on appeal the fifth issue listed, which
concerned the Bankruptcy Court's subject matter jurisdiction.

See, e.g., Notice of Appeal, Picard v. Fox, No. 10 Civ. 7101 (S.D.N.Y. Sept. 16, 2010), ECF No. 1, Ex. A ("Striking Order"), at 1-2.

After the Bankruptcy Court's ruling on the preliminary injunction, Picard reached a settlement with the Picower defendants pursuant to which the Picower defendants agreed to return $5 billion to the BLMIS estate, and to forfeit an additional amount of over $2.2 billion to the Government. See Settlement Agreement at 3. That money, over $7.2 billion in total, is currently in escrow pending the entry of a final, nonappealable order approving the settlement. Id. As part of the settlement agreement, Picard agreed to seek a permanent injunction pursuant to § 105(a) barring claims against the Picower defendants by BLMIS investors that are duplicative or derivative of the claims that were brought, or that could have been brought, by Picard. See id. at 5-6.

In December, 2010, Picard filed a motion in the Bankruptcy Court to approve the settlement, and to enter a permanent injunction as contemplated by the settlement agreement. Fox and Marshall objected to the settlement and the permanent injunction. See Settlement Order at 1-2. In a January 2011 Order, the Bankruptcy Court approved the settlement, finding that the settlement was fair, reasonable, equitable, and in the best interests of the BLMIS estate. Id. at 6. The Bankruptcy

Court also issued a permanent injunction barring claims against the Picower defendants by third parties that are duplicative or derivative of the claims that were brought, or that could have been brought, by Picard.  See id. at 6-7.

The current appeals concern a number of the Bankruptcy Court's orders.  Fox and Marshall appeal the order of the Bankruptcy Court declaring that the Florida Actions violated the automatic stay, and were therefore void ab initio, and the preliminary injunction issued by the Bankruptcy Court pursuant to § 105(a) enjoining the Appellants from proceeding with the Florida Actions to the extent that those actions were not barred by § 362(a).  Fox and Marshall also appeal the Bankruptcy Court's order striking certain issues and corresponding portions of the record from their appeal of those rulings.  Fox and Marshall also appeal separately the Bankruptcy Court's order approving the settlement agreement entered into by Picard with the Picower defendants, and the issuance of the permanent injunction that accompanied the approval of the settlement to the extent that it permanently bars them from prosecuting the Florida Actions.

A district court reviews a bankruptcy court's findings of fact for clear error and its legal conclusions de novo.  See In re Bell, 225 F.3d 203, 209 (2d Cir. 2000); In re Metaldyne

Corp., 421 B.R. 620, 624 (S.D.N.Y. 2009); Fed. R. Bankr. P.
8013.


## II.

As an initial matter, Fox and Marshall appeal the
Bankruptcy Court's Striking Order.  They argue that the
Bankruptcy Court exceeded its jurisdiction by striking the fifth
issue from their statement of issues on appeal.  The issue that
the Bankruptcy Court struck was "[w]hether the Bankruptcy Court
erred by not determining that the trustee . . . was barred by
the doctrine of in pari delecto [sic] from pursuing the claims
asserted by the Appellants in their complaints in Florida
federal court . . . ."  Designation of the Record of Appellant
Fox at 11, In re Madoff, No. 10 Civ. 4652 (S.D.N.Y. June 15,
2010), ECF No. 3; see also Striking Order at 3.

The Federal Rules of Bankruptcy Procedure require
appellants from a decision by a bankruptcy court to file, within
fourteen days of filing their notice of appeal, "a designation
of the items to be included in the record on appeal and a
statement of the issues to be presented."  Fed. R. Bankr. P.
8006.  With regard to the statement of the issues to be
presented, courts in this Circuit have held that a district
court may consider issues on appeal that are not included in
that statement, because Rule 8006 "is not intended to bind

either party to the appeal as to the issues that are to be presented." In re Cohoes Indus. Terminal, Inc., 90 B.R. 67, 70 (S.D.N.Y. 1988) (internal quotation marks and citation omitted).

Both of the parties cite cases indicating that a bankruptcy court has the power to strike documents from, and otherwise shape, the record on appeal, even after a notice of appeal has been filed. See, e.g., In re Ames Dep't Stores, Inc., 320 B.R. 518, 520 n.2 (Bankr. S.D.N.Y. 2005) ("[T]he docketing of the appeal in the district court did not divest the bankruptcy court of jurisdiction to determine the contents of the record on the appeal"). However, the power of a bankruptcy court to strike irrelevant documents from the record is not at issue.[1] The question is whether a bankruptcy court may strike issues from appellate review by the district court. The parties cite no case that directly addresses the proposition.

Nevertheless, it is plain that a bankruptcy court lacks the power to prevent a district court from considering legal

_____

[1] The Bankruptcy Court did purport to strike certain documents in its Striking Order. However, it did so because it was striking issue number five, and the relevant documents were alleged to be related to issue five. To the extent that this Court is considering issue five, the basis for the Bankruptcy Court's striking the documents—their lack of relevance—no longer applies. Moreover, "[t]here is authority for the proposition that even though matters were not considered by the court below, an application may still be made to the appellate court to supplement the record, for background, clarifications, or the like." Ames, 320 B.R. at 522-23 n.8.

arguments on appeal.  No such power is specified in the
jurisdictional statutes related to bankruptcy proceedings.  <u>See,
e.g.</u>, 28 U.S.C. §§ 157, 158.  More broadly, such a power, if it
existed, would allow bankruptcy courts to insulate their legal
decisions from review by Article III courts, in contravention of
well-established Supreme Court precedent.  <u>See N. Pipeline
Constr. Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50, 77 (1982)
("[T]he power to adjudicate 'private rights' must be vested in
an Art. III court.").  District court review of bankruptcy court
decisions was designed specifically to avoid that result.

The Trustee argues that, in any event, the arguments raised
in issue five—that the Bankruptcy Court ignored the doctrine of
<u>in pari delicto</u> (and the related <u>Wagoner</u> Rule)—were waived
because they were not raised before the Bankruptcy Court.
"However, a court sitting on the appellate level has discretion
to hear a new issue when necessary to avoid a manifest injustice
or where the issue is purely legal and does not require
additional fact-finding."  <u>In re Vargas Realty Enters., Inc.</u>,
440 B.R. 224, 234 (S.D.N.Y. 2010) (citing <u>Matar v. Dichter</u>, 563
F.3d 9, 13 n.4 (2d Cir. 2009)).  The Court will exercise its
discretion and consider issue five in this case, because issue
five raises legal issues concerning the applicability of the
doctrine of <u>in pari delicto</u> and the <u>Wagoner</u> Rule that require no
further fact-finding.

Accordingly, the Striking Order of the Bankruptcy Court is **VACATED**.  This Court will consider issue five in conjunction with the Appellants' other arguments.

**III.**

The Appellants appeal the Bankruptcy Court's order explained in the Automatic Stay Decision, that declared that the Florida Actions were barred by the automatic stay and were therefore void, and that further preliminarily enjoined the Appellants from pursuing the Florida Actions pursuant to § 105(a).  The central issue in this appeal is whether the Bankruptcy Court had the power to declare the Florida Actions void and otherwise to enjoin the Appellants from prosecuting them.  That question hinges on the nature of the Florida Actions—whether they are independent actions, or whether they are derivative or duplicative of claims that were the property of the BLMIS estate.

**A.**

**1.**

The automatic stay provision of the Bankruptcy Code operates to enjoin, among other things, "any act to obtain possession of . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  "[A]ll legal or equitable

16

interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held," are property of the estate.  Id. at § 541(a)(1).  Causes of action may be property of the estate.  In re Jackson, 593 F.3d 171, 176 (2d Cir. 2010).  Indeed, "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach" of the term "property of the estate."  In re Saint Vincents Catholic Med. Ctrs. of N.Y., 449 B.R. 209, 217 (S.D.N.Y. 2011) (quoting Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008)).

In addition, the automatic stay operates to enjoin "the commencement or continuation . . . [of an] action or proceeding against the debtor . . . , or to recover a claim against the debtor . . . ."  11 U.S.C. § 362(a)(1), (6).  Actions "to recover a claim against the debtor" can include actions by creditors against the debtor's transferees in certain circumstances.  See Colonial, 980 F.2d at 128, 132 (Florida fraudulent conveyance action by the FDIC against the wife of one of the general partners of the debtor partnership was barred by § 362(a)(1)).

A major objective of the automatic stay is "to prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected."  S.E.C. v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000) (internal quotation marks omitted).  "In

17

addition, the automatic stay provision is intended to allow the
bankruptcy court to centralize all disputes concerning property
of the debtor's estate so that reorganization can proceed
efficiently, unimpeded by uncoordinated proceedings in other
arenas." Id. (internal quotation marks omitted).  As the
Bankruptcy Court noted, "[t]he automatic stay is one of the most
fundamental bankruptcy protections and applies broadly to
'give[] the debtor a breathing spell' and to prevent creditors
from 'obtain[ing] payment of the[ir] claims in preference to and
to the detriment of other creditors.'" Automatic Stay Decision,
429 B.R. at 430 (quoting H.R. Rep. No. 95-595, at 340 (1977) and
S. Rep. No. 95-989, at 49 (1978)); see also St. Paul Fire &
Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701 (2d Cir.
1989) ("Congress intended to protect all creditors by making the
trustee the proper person to assert claims against the debtor.
This reasoning extends to common claims against the debtor's
alter ego or others who have misused the debtor's property in
some fashion.").

     The Court of Appeals for the Second Circuit has explained
that "actions taken in violation of the stay are void and
without effect." Colonial, 980 F.2d at 137 (internal quotation
marks omitted).

**2.**

In this case, the Bankruptcy Court held that the claims asserted in the Florida Actions against the Picower defendants are the property of the estate pursuant to § 362(a)(3), and thus that the Florida Actions were void and without effect because they were filed in violation of the automatic stay.  See, e.g., In re The 1031 Tax Grp., LLC, 397 B.R. 670, 681-82 (Bankr. S.D.N.Y. 2008) (causes of action that "are property of the estate pursuant to Bankruptcy Code § 541 . . . are subject to the automatic stay under Bankruptcy Code § 362(a)(3)").  The Court of Appeals for the Second Circuit has explained that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."  St. Paul, 884 F.2d at 701; see also, e.g. Pereira v. Farace, 413 F.3d 330, 342 (2d Cir. 2005).  This reasoning applies to claims against a non-debtor third party. St. Paul, 884 F.2d at 701.[2]

---

[2] The Appellants argue that St. Paul does not apply in this case because in St. Paul the creditors had asserted a fraudulent transfer claim, while the appellants here did not assert such a claim in the Florida Actions.  This argument is unpersuasive because, as explained more fully below, the Florida Actions are duplicative and derivative of the Trustee's fraudulent transfer claim.

In this case, neither of the Appellants disputes that the factual allegations in their respective Florida complaints are virtually identical to those made by Picard in his New York Action against the Picower defendants. (See, e.g., Oral Arg. Tr. 5, Dec. 19, 2011 ("Let's assume they are substantially the same facts, I suggest.").)  Indeed, the complaints in the Florida Actions explicitly rely on the Trustee's complaint in the New York Action, (see, e.g., Fox Complaint ¶ 3), and cite to the Trustee's complaint throughout. (See, e.g., Fox Complaint ¶¶ 15-28, 30-31, 37-38, 43, 46, 55, 59-60, 63.)  The Florida Actions, like Picard's New York Action, are based upon the same conduct by the Picower Defendants: involvement in the Madoff Ponzi scheme, and the transfer of billions of dollars in BLMIS-held customer funds to the Picower defendants.  The Florida complaints contain no additional allegations of acts by the Picower defendants that were directed toward the Appellants specifically, or any duty owed specifically to the Appellants by the Picower defendants.  Put bluntly, the wrongs pleaded in in the Florida Actions and in the Trustee's action are the same. Cf. In re Granite Partners, L.P., 194 B.R. 318, 325 (Bankr. S.D.N.Y. 1996) ("To determine [whether a trustee has] standing [to assert a claim], the court must look to the nature of the wrongs alleged in the complaint without regard to the plaintiff's designation, and the nature of the injury for which

relief is sought . . . ." (citations omitted)); <u>Kramer v. W.
Pac. Indus., Inc.</u>  546 A.2d 348, 352 (Del. 1988) (cited by
<u>Granite Partners</u>, 194 B.R. at 325) ("In determining the nature
of the wrong alleged, a court must look to the body of the
complaint, not to the plaintiff's designation or stated
intention." (internal quotation marks omitted)) (shareholder
derivative suit context).

　　　　The alleged wrongful acts harmed every BLMIS investor
(and BLMIS itself) in the same way: by withdrawing billions of
dollars in customer funds from BLMIS and thus substantially
diminishing the assets available to BLMIS to pay its customers
and creditors, and to continue to function.  Indeed, the very
essence of the allegations against the Picower defendants is
that they paid themselves out of assets that comprised other
customers' accounts, thereby diminishing the value of BLMIS.
(<u>See, e.g.</u>, Fox Complaint ¶ 73 ("Defendants participated in and
profited from the fraud on other BLMIS customers, and . . .
converted the cash (there were no securities) of other BLMIS
account holders to pay themselves these fictitious profits.").)
There is no allegation that the Picower defendants owed any duty
directly to the Appellants.  <u>Cf.</u> <u>In re Johns-Manville Corp.</u>, 517
F.3d 52, 55 (2d Cir. 2008) ("[T]he bankruptcy court erred
insofar as it enjoined suits that, as a matter of state law, are
predicated upon an independent duty owed by Travelers to the

Appellants . . . ."), rev'd on other grounds sub nom, Travelers
Indem. Co. v. Bailey, 129 S. Ct. 2195 (2009); Granite Partners,
194 B.R. at 325 (noting that a third party may be subject to
suit directly by the shareholders of a debtor "where the
allegedly wrongful conduct violates a separate duty to the
complaining shareholder independent of the fiduciary duties that
the wrongdoer owes to all of the shareholders").  The claims
asserted in the Florida Actions are, at bottom, "general
one[s]," St. Paul, 884 F.2d at 701, that seek to recover for an
injury that was inflicted not by specific acts of the Picower
defendants directed toward the Appellants themselves, and not by
violating a duty owed directly to the Appellants, but by a
single set of actions that harmed BLMIS and all BLMIS customers
in the same way and for the same reason.

Moreover, the claims asserted in the Florida Actions are
claims that "could be brought by any creditor of the debtor."
Id.  Indeed, Appellant Marshall, at oral argument, asserted that
"every single [BLMIS] customer" could have brought the claims
alleged in the Florida Actions.  (Oral Arg. Tr. at 17.)  Even
without that concession, though, it is plain that every BLMIS
customer suffered the same types of damages asserted by the
Appellants in the Florida Actions.  The damages are all based on
the alleged actions of the Picower defendants withdrawing funds
from BLMIS to which they were not entitled and thereby

diminishing the funds that could otherwise be paid to the customers of BLMIS in an appropriate distribution mechanism which has been found to be the Net Equity method.  The Appellants attempt to circumvent this obvious proposition by arguing that they are seeking different damages from the distributions to be made according to the Net Equity method. They claim that they are seeking the lost time-value of their investments as well as any taxes paid on gains that never existed.  But these are all the same types of damages that could be claimed by other BLMIS customers in general.  Every BLMIS investor did not receive their final BLMIS balance, and thus lost the time-value of their investment, as well as any taxes paid on gains that never existed.  Some BLMIS customers did not withdraw an amount greater than their principal investment, and thus lost some of their principal investment in the Madoff scheme, and those investors are SIPA payees who are eligible to make a claim against the BLMIS estate for their principal investment.  See generally Net Equity Decision.  But the loss of any principal investment by the SIPA payees was in addition to the loss of the time-value of their investment and any tax costs associated with the fictitious gains on their accounts.  Those alleged losses were suffered by every BLMIS customer, whether a SIPA payee or not, in the same way and for the same reason, and any cause of action asserting those damages, based on the

generalized facts alleged in the Florida Actions (and in the Trustee's New York Action) are therefore common to all BLMIS customers.  See St. Paul, 884 F.2d at 704 ("This, however, is precisely the situation that the Bankruptcy Code is designed to eliminate. . . .  All . . . creditors are to be treated equally if their injuries are not different in kind."); see also Steinberg v. Buczynski, 40 F.3d 890, 893 (7th Cir. 1994) ("[T]here is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct—not derivative—claim against the third party, which only the creditor himself can enforce.").

    In this case, there ultimately is no substantive difference between the claims already asserted by the Trustee, on behalf of the BLMIS estate, in the New York Action, and those claims asserted in the Florida Actions.  See, e.g., MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92-93 (2d Cir. 1988) (the bankruptcy court could enjoin suits by plaintiffs whose rights were "derivative" of the debtor's rights, because the "plaintiffs' claims are inseparable from [the debtor's] and are consequently well within the Bankruptcy Court's jurisdiction over [the debtor's] assets.")  Because the claims asserted in the Florida Actions are general claims common to all BLMIS investors that are substantively duplicative of the Trustee's

24

fraudulent transfer action, the Bankruptcy Court correctly found that the claims asserted in the Florida Actions were the property of the estate.

### 3.

The Appellants argue that, unlike the causes of action in the Trustee's New York Action, which sound in bankruptcy, the Florida Actions assert causes of action that sound in tort. However, this nominal difference does not amount to a substantive difference. If potential creditors could bypass the automatic stay injunction by simply pleading around it, even when the substance of their claims—the wrongful acts pleaded, the relationships and duties between the actors, the nature of the damages suffered—was identical to the substance of an action already brought by a trustee, the bankruptcy laws' core purpose would be severely undermined, because some potential creditors could "obtain[] payment of the[ir] claims in preference to and to the detriment of other creditors" simply by styling their pleadings as sounding in tort.[3] Automatic Stay Decision, 429

---

[3] Courts look to state law to determine whether a claim is the property of the estate and so should be asserted by the trustee. See, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995). However, the Appellants have not argued that their claims are not the property of the estate or are not otherwise barred because of some particular element of Florida law. In any event, under Florida law, fraudulent transfer actions involving payments to third-parties in connection with a

B.R. at 430 (second alteration in original) (quoting H.R. Rep. No. 95-595, at 340  (1977) and S. Rep. No. 95-989, at 49 (1978)).

To the extent that the Appellants urge that the claims asserted in the Florida Actions are not property of the estate by virtue of the names of the causes of action asserted, this argument is unpersuasive.  While as a general matter a court should accept as true the allegations pleaded in a complaint at this stage in a case, that principle has limits.  The Court of Appeals for the Second Circuit has rejected "rigid reading[s] of 'property of the estate,'" explaining that the meaning of that term is "broad."  United States v. Whiting Pools, Inc., 674 F.2d 144, 150 & n.10 (2d Cir. 1982), aff'd, 462 U.S. 198 (1983); see also Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 218 (Cardozo, J.) ("To fix the meaning of [provisions of the Bankruptcy Code] there is need to keep in view . . . the structure of the statute, and the relation, physical and logical, between its several parts."); Matter of Commonwealth Oil Refining Co., Inc., 805 F.2d 1175, 1187 (5th Cir. 1986) ("[T]he legislative intent underlying § 362[] should not be

_____

Ponzi scheme are properly brought by the trustee of the estate. See, e.g., In re Old Naples Secs., Inc., 343 B.R. 310, 320-321 (Bankr. M.D. Fla. 2006).  Because the claims asserted in the Florida action are duplicative of the Trustee's fraudulent transfer action, Florida law does not alter the conclusion that those claims are the property of the estate.

undermined by artful pleading that depends on form rather than substance." (citation and internal quotation marks omitted)). Indeed, courts in this district have looked past the nominal title of the cause of action pleaded in assessing whether or not a claim is in substance duplicative or derivative of a claim that is the property of the Trustee.  See In re Ionosphere Clubs, Inc., 156 B.R. 414, 439 (S.D.N.Y. 1993) ("The creditor of any bankrupt may allege that the prior dealings of other parties with the bankrupt rendered it insolvent; however, such a claim is for fraudulent conveyance properly brought by the Trustee, not for tortious interference of contract."), aff'd, 17 F.3d 600 (2d Cir. 1994).  In substance, the claims asserted in the Florida Actions are duplicative of those asserted in the Trustee's New York Action, and they are therefore the property of the estate, and cannot be asserted by the Appellants because of the automatic stay notwithstanding the Appellants' renaming of the causes of action asserted.


### 4.

The Appellants argue that the Court of Appeals' 2008 opinion in the long-running Johns-Manville case supports their position that the Florida Actions are independent and thus belong to the individual creditors rather than the Trustee.  It does not.

In Johns-Manville, the Direct Action plaintiffs, a group of claimants injured by asbestos produced by Johns-Manville, alleged that Travelers, Manville's insurer, had injured them by failing to warn them of the dangers of asbestos.  517 F.3d at 58.  Travelers, in other words, had allegedly taken actions and violated duties to the Direct Action plaintiffs that were different from the contractual obligations between Travelers and Johns-Manville that were the basis for Travelers' involvement in the Manville bankruptcy.  See, e.g., Travelers, 129 S. Ct. at 2200 n. 2 ("[M]any of the suits at issue seek to hold Travelers liable for independent wrongdoing rather than for a legal wrong by Manville."), on remand, In re Johns-Manville Corp., 600 F.3d 135, 151-52 (2d Cir. 2010) (noting that "whatever the text" of the bankruptcy court's earlier order that was held to bar the Direct Action claims in Travelers, the Direct Action claims appeared to be independent).  Here, by contrast, the actions by the Picower defendants that allegedly harmed the Appellants are the same actions which form the basis of the Trustee's action against the Picower Defendants.  As explained above, the allegedly independent damages suffered by the Appellants were suffered by all BLMIS customers, and are only distinguishable from the damages suffered by the estate, if at all, by virtue of the Net Equity Decision, and not by virtue of any actions taken or duties owed by the Picower defendants.  The Florida Actions

28

lack the basic indicia of independence that existed with regard to the Direct Action plaintiffs' claims in Johns-Manville, and that decision therefore provides no rule that can support the Appellants' argument.[4]

5.

The Appellants also argue that the Wagoner Rule, and the related doctrine of in pari delicto, would bar the Trustee from asserting the claims asserted in the Florida Actions.  They argue that, because those rules would bar the trustee from bringing the Florida Actions, the Florida Actions cannot be the property of the estate.  "[A] bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself."  Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991).  "[W]hen a bankrupct corporation has joined with a third party in defrauding its

---

[4] The Appellants' reliance on Cumberland Oil v. Thropp, 791 F.2d 1037 (2d Cir. 1986) fails for similar reasons.  In that case, the Court of Appeals for the Second Circuit held that an intentional fraud claim against the business associate of the debtor was "not merely an artful repleading of claims that were discharged in bankruptcy because Cumberland has alleged with particularity that misrepresentations of facts were made by Gregory Thropp in furtherance of a conspiracy to defraud Cumberland."  Id. at 1043.  The Appellants point to no allegations in their complaints that indicate that the Picower defendants intended to defraud them in particular or made any specific misrepresentations to them.

creditors, the trustee cannot recover against the third party for the damages to the creditors." Id.; see also In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997). "The rationale for the Wagoner rule is the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." In re Bennett Funding Grp., Inc., 336 F.3d 94, 100 (2d Cir. 2003) (internal quotation marks omitted). The Wagoner Rule derives from the common law doctrine of in pari delicto. See, e.g., In re Hampton Hotel Investors, L.P., 289 B.R. 563, 574-76 (Bankr. S.D.N.Y. 2003); Kirschner v. KPMG LLP, 938 N.E.2d 941, 947, 950 (N.Y. 2010).

As an initial matter, the Appellants' argument fails because "[t]he Wagoner Rule does not . . . apply to causes of action that the Bankruptcy Code specifically confers on a trustee or a debtor in possession." In re Park South Securities, LLC., 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005); see also In re Skyway Commc'ns Holding Corp., 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008) (in pari delicto does not apply to avoidance actions brought by a trustee pursuant to § 544). As explained above, the claims asserted in the Florida Actions are duplicative of the fraudulent transfer claims already asserted by the Trustee in the New York Action, and the Trustee's

standing to assert those claims is not contested.[5]   The

Appellants' <u>Wagoner</u> argument is premised on the assumption that

_____

[5] While the Appellants did not argue that the Trustee lacked
standing to assert the claims asserted in the New York Action,
Appellant Marshall, in a letter to the Court after oral
argument, asserted that the Bankruptcy Court lacked the
authority to enter final judgment on the Trustee's fraudulent
conveyance claims under the Supreme Court's recent decision in
<u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011).   This argument is
unpersuasive.   <u>Stern</u> did not concern the jurisdiction of a
bankruptcy court to hear a claim, but only the limitations on
its ability to enter certain final judgments.   Further,
Appellant Marshall points to no language in <u>Stern</u> that can
reasonably be interpreted as holding that the power explicitly
accorded by Congress to the bankruptcy courts to enter judgment
in fraudulent transfer actions such as the New York Action
violates Article III of the United States Constitution.   The
specific issue in <u>Stern</u> was the constitutional authority for a
bankruptcy court to enter judgment on a state law counterclaim
that is not resolved in the process of ruling on a creditor's
proof of claim.   <u>Id.</u> at 2620.   The Court in <u>Stern</u> said that its
decision was a "narrow" one and purported not to "meaningfully
change[] the division of labor in the [bankruptcy] statute."
<u>Id.</u>   The adjudication of fraudulent transfer and avoidance
actions is a basic feature of that division of labor.   <u>See</u> 28
U.S.C. § 157(b)(2)(F), (H) (providing for bankruptcy court
jurisdiction over avoidance actions and fraudulent conveyance
actions).

Appellant Marshall also points to the reliance in <u>Stern</u> on
<u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33 (1989).
<u>Granfinanciera</u> held that there was a right to a jury trial on a
fraudulent conveyance action by a trustee against a third party
who had not submitted a claim against the estate, and rejected
an argument that the "public rights" exception applied to such a
claim.   <u>Id.</u> at 55-56.   In this case, each of the Appellants, as
well as the Picower defendants, did bring claims against the
BLMIS estate.   Moreover, this case does not involve the right to
a jury trial.   Rather, it involves orders of the Bankruptcy
Court that were not final judgments and the approval of a
settlement agreement under Bankruptcy Rule 9019.   <u>See</u> <u>In re
Ambac Fin. Grp., Inc.</u>, 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011)
("Whatever <u>Stern v. Marshall</u> may ultimately be held to mean, . .
. it most certainly does not stand for the proposition that the

the Florida Actions assert claims that are independent and
distinct from the Trustee's New York Action.  See Hirsch v.
Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995)
("[W]hen creditors . . . have a claim for injury that is
particularized as to them, they are exclusively entitled to
pursue that claim, and the bankruptcy trustee is precluded from
doing so.").  Because that assumption is false in this case, the
Wagoner argument fails.

Moreover, the Appellants' argument would require a
significant expansion of the Wagoner Rule.  The Appellants rely
on decisions from courts in this district that have held that
claims by the Trustee against various parties allegedly involved
in the Madoff Ponzi scheme were barred under the Wagoner Rule
and the doctrine of in pari delicto.  See Picard v. JPMorgan
Chase & Co., 460 B.R. 84, 90-92 (S.D.N.Y. 2011) (McMahon, J.);
see generally Picard v. HSBC Bank PLC, 454 B.R. 25 (S.D.N.Y.
2011) (Rakoff, J.).  However, in those cases, the party bringing
the lawsuit was the Trustee, and not an individual BLMIS
customer, as here.  Because Wagoner implicates a trustee's
standing, it was plainly at issue in those cases where the
Trustee was the plaintiff.  However, the Appellants cite no case
that holds that the mere possibility that a claim might be

---

bankruptcy court cannot approve the compromise and settlement of
a claim which is indisputably property of a debtor's estate.")

barred or subjected to a meritorious defense if it were asserted
by the trustee renders the claim independent and not the
property of the estate for the purposes of an action by the
trustee to enforce the § 362 automatic stay when a creditor
brings that claim.  Nor do they cite any case that holds that a
trustee lacks standing to bring an action to enforce the
automatic stay with regard to a claim against a third party
because the trustee might hypothetically lack standing to assert
the same claim against the third party.

There is good reason for this lack of precedent.  Even if
the Trustee might be barred from asserting the claims against
the Picower defendants in the Florida Actions in the exact form
in which the Appellants have pleaded them, that fact cannot be
dispositive of the question of whether the Florida Actions are
covered by the automatic stay.  To apply Wagoner here, where the
Trustee did not bring the Florida Actions, would perversely
require ruling on a hypothetical controversy over the Trustee's
standing to bring an action that the Trustee never brought when
the Trustee had the right and the standing to bring the New York
Action alleging fraudulent conveyances and when the Florida
Actions are an end run around the New York Action.

Nor does the doctrine of in pari delicto prevent the claims
asserted in the Florida Actions from being property of the
estate.  While Wagoner is a federal rule of standing, in pari

delicto is an affirmative defense of state common law.  See
Kirschner, 938 N.E.2d at 959-60; see also Perlman v. Wells Fargo
Bank, N.A., No. 10 Civ. 81612, 2011 WL 5873054, at *6-*7 (S.D.
Fla. Nov. 22, 2011).  A trustee inherits the claims of the
estate "subject to whatever infirmities (such as an in pari
delicto defense) that may have existed" as to those claims.  In
re Food Mgmt. Grp., LLC, 380 B.R. 677, 693 (Bankr. S.D.N.Y.
2008).  The Appellants seek to invalidate the Bankrupcty Court's
orders based on a hypothetical claim that the Trustee did not
bring and based on a hypothetical defense that the Picower
defendants did not assert in the hypothetical lawsuit.  The
Appellants cannot defeat the straightforward fact that their
lawsuits were duplicative of the New York Action that the
Trustee had the right to bring.

     In sum, applying Wagoner and in pari delicto as swords for
creditor-plaintiffs seeking to work around a bankruptcy court
would allow creditors to plead around the automatic stay, and
obtain judgments without the bankruptcy system, based on claims
that are derivative or duplicative of claims that are the
property of the estate.  These doctrines do not apply in this
case.  Because the automatic stay bars the Florida Actions, the
Bankruptcy Court's determination in that regard is **AFFIRMED**.

## B.

The Appellants also appeal the Bankruptcy Court's extension of the Automatic Stay to cover the Florida Actions pursuant to § 105(a).  Preliminary injunctions entered by the Bankruptcy Court pursuant to § 105(a) are reviewed for abuse of discretion.  See, e.g., In re Calpine Corp., 365 B.R. 401, 407 (S.D.N.Y. 2007).

As an initial matter, because the Bankruptcy Court correctly found that the Florida Actions were void ab initio because they violated the Automatic Stay Order, any error in entering the preliminary injunction was harmless, because there was nothing left of the Florida Actions to enjoin under § 105(a).  Indeed, the Bankruptcy Court only issued the § 105(a) injunction "[t]o the extent section 362(a) and the District Court Stay Orders do not apply in their own right to stay the Florida Actions."  Automatic Stay Decision, 429 B.R. at 434.

Nevertheless, the Bankruptcy Court was well within its powers under § 105(a) in enjoining the Florida Actions.  Under § 105(a), a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  "The Bankruptcy Court has authority under section 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings."  Saint Vincents, 449 B.R. at 217

(quoting In re Baldwin-United Corp. Litig., 765 F.2d 343, 348
(2d Cir. 1985)) (alteration omitted).  "Under Section 105,
bankruptcy courts may extend the automatic stay to enjoin suits
by third parties against third parties if they threaten to
thwart or frustrate the debtor's reorganization efforts."  Id.
(internal alteration, quotation marks, and citation omitted).

The Bankruptcy Court found that a § 105(a) injunction was
proper in this case because the Florida Actions posed a threat
to the BLMIS estate.  The Bankruptcy Court reasoned that the
Florida Actions threatened to hamper the Trustee's ability to
collect on any judgment he might obtain in the pending New York
Action against the Picower defendants, because "[b]oth the
Trustee and Florida Plaintiffs target the same limited pool of
funds originating with BLMIS."  Automatic Stay Decision, 429
B.R. at 435.  Moreover, the Bankruptcy Court found that the
Florida Actions threatened the ongoing settlement negotiations
between the Picower defendants and Picard because those parties
were "on the brink of a settlement," id., and the Florida
actions might raise the specter of double liability for the same
conduct, making the Picower defendants less likely to settle.
Cf. In re Dreier LLP, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010)
("Absent that power [to enjoin third party suits], the Trustee[]
will be hampered in their ability to pursue and ultimately
settle fraudulent transfer claims from a transferee fearful of

36

paying twice for the same transfer—once on the Trustees' claim and a second time on the derivative claim." (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992)).

The Appellants do not challenge that reasoning.  Rather, they appear to argue that the potential that they might recover assets that might otherwise be recovered by the estate is irrelevant, because the Florida Actions were independent and thus the Bankruptcy Court lacked jurisdiction over them.  This argument simply rehashes those arguments made against the application of the automatic stay, and is unpersuasive.[6]  The Appellants do not address the Bankruptcy Court's conclusion that the Florida Actions would have an immediate adverse economic consequence for the debtor's estate, by jeopardizing the BLMIS estate's ability to recover billions of dollars.  Because the Florida Actions plainly did jeopardize the estate's ability to recover fraudulently transferred assets from the Picower Defendants, either through litigation or through settlement, the

---

[6] The Appellants additionally argue that, unlike in other cases where § 105(a) was properly used to enjoin litigation by a creditor against a non-debtor third party, see, e.g., Fisher v. Apostolou, 155 F.3d 876, 883 (7th Cir. 1998), in this case, they are not creditors of the estate.  This is incorrect.  Because they entrusted money to BLMIS for the purpose of trading securities, the appellants are considered "customers," a privileged subset of creditors, under SIPA.  See 15 U.S.C. § 78lll(2); Rosenman Family LLC v. Picard, 395 F. App'x 766, 768–70 (2d Cir. 2010) (summary order).  Indeed, the Appellants filed proofs of claim in the bankruptcy.  To the extent the Appellants have based their arguments on the assertion that they are not customers, then, those arguments must fail.

Bankruptcy Court's granting a § 105(a) injunction on this basis was proper.

The Bankruptcy Court also found that a § 105(a) injunction was warranted because the Florida Actions interfered with the Bankruptcy Court's jurisdiction, because allowing their "further prosecution could ultimately result in another court's determining how potential estate funds are distributed among certain BLMIS customers." Automatic Stay Decision, 429 B.R. at 437. The Bankruptcy Court found this "particularly alarming" because the Florida Actions, if successful, could result in distributions to BLMIS customers outside of the plan that was determined by the Net Equity Decision, and could result in inconsistent judgments if the Court of Appeals for the Second Circuit affirmed the Net Equity Decision (which it subsequently did). Id. A Bankruptcy Court's power to enjoin litigation by creditors against third parties extends to situations where "creditors . . . assert general, indirect claims in order to achieve a greater distribution on a first come, first serve basis from assets which the trustee has standing to recover, and which, if recovered, will be available to satisfy the claims of all creditors." In re Keene Corp., 164 B.R. 844, 854 (Bankr. S.D.N.Y. 1994) (enjoining lawsuits under § 105(a)); see also 15 U.S.C. § 78eee(b)(2)(A)(i) (providing for the exclusive

jurisdiction of the Bankruptcy Court over distribution determinations under SIPA).

In short, as the Bankruptcy Court correctly recognized, its broader powers under § 105(a) could appropriately enjoin the Appellants from prosecuting the Florida Actions even if the claims asserted in those actions were not the property of the estate, because "the overlap between the claims" asserted in the New York Action and the Florida Actions is "so closely related that allowing the [Appellants] to convert the bankruptcy proceeding into a race to the courthouse would derail the bankruptcy proceedings." Fisher v. Apostolou, 155 F.3d 876, 883 (7th Cir. 1998). Accordingly, the Bankruptcy Court's order under § 105(a) is **AFFIRMED.**

## IV.

### A.

The Appellants also appeal the Bankruptcy Court's January 13, 2011 Order approving the Settlement between the Picower defendants and the Trustee, and permanently enjoining any duplicative actions against the Picower defendants pursuant to § 105(a).

A Bankruptcy Court's approval of a settlement agreement is reviewed for abuse of discretion. See, e.g., In re Iridium Operating LLC, 478 F.3d 452, 461 n.13 (2d Cir. 2007). A

bankruptcy court's holdings on underlying legal issues are reviewed de novo.  Id.  Similarly, the issuance of a permanent injunction in connection with the settlement is reviewed for abuse of discretion, but the underlying determination of legal questions is reviewed de novo.  See, e.g., In re Calpine Corp., 365 B.R. 401, 407 (S.D.N.Y. 2007).

The factors that courts in the Second Circuit consider when approving bankruptcy settlements are well established.  These interrelated factors are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

Iridium, 478 F.3d at 462 (internal quotation marks and citations omitted).

With regard to permanent injunctions of creditor suits against a third party issued in connection with a settlement agreement between the third party and the trustee, a bankruptcy court generally may not enjoin creditor claims against the third

40

party when those claims are independent and "personal to the
creditor."  See In re Mrs. Weinberg's Kosher Foods, Inc., 278
B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (citing In re Energy
Coop., Inc., 886 F.2d 921, 930 (7th Cir. 1989)); see generally
In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141-43 (2d
Cir. 2005) (a nonconsensual release of non-debtor claims by the
bankruptcy court "should not be approved absent the finding that
truly unusual circumstances render the release terms important
to success of the plan").  However, a bankruptcy court may
enjoin actions that are derivative or duplicative of claims
brought by the trustee, or that could have been brought by the
trustee in the first instance.  See Dreier, 429 B.R. at 133-34
("[T]he Court has the jurisdiction . . . to bar general
creditors . . . from recovering their claims . . . where their
claims are based on the debtors' misconduct, and there is no
independent basis for an action against [a third party
defendant] other than its receipt of the transfers from [the
debtor].") (suggesting that an amended Bar Order describing a
permanent injunction be "limited to derivative claims"); see
also Bar Order at 3, In re Dreier, Case No. 08-15051 (Bankr.
S.D.N.Y. June 8, 2010), ECF No. 610 (approving subsequent Bar
Order but exempting from release any claim or cause of action by
a creditor claimant that "(1) is not derivative of Claims or
Causes of Action that constitute property of . . . [the] estate;

41

(2) seeks to recover for a particularized injury to the Creditor
Claimant that is distinct from any general injury suffered by
all creditors of [the debtor]; and (3) is based upon the breach
of an independent legal duty owed by a . . . Releasee to the
Creditor Claimant"), aff'd, In re Dreier LLP, Nos. 10 Civ. 4758
& 5669, 2010 WL 3835179, at *5 (S.D.N.Y. Sept. 10, 2010); Mrs.
Weinberg's, 278 B.R. at 365 (holding that, in approving a
settlement, a bankruptcy court "may enjoin creditors from
prosecuting the settled claims derivatively in another court"
(citing In re Ionosphere Clubs, Inc., 17 F.3d 600, 604 (2d Cir.
2004)) (liquidation proceeding).

## B.

As an initial matter, the Appellants argue that the
settlement amount—over $7.2 billion including the amounts to be
forfeited to the Government-is insufficient, and that the
settlement is unfair to the creditors for this reason, among
others.  The Appellants' argument with regard to the financial
terms of the settlement agreement borders on the frivolous.  The
Bankruptcy Court found, and the Appellants do not contest, that
the total amount forfeited by the Picower defendants for payment
to the Madoff victims is "one hundred percent of the net
withdrawals received by the Picower BLMIS Accounts."  Settlement

42

Order at 4.   Indeed, the agreement also provides for the extinguishment of the Picower defendants' claims against the estate, which increases the likelihood that additional sums may be available to other customers and creditors.   Settlement Order at 5.   The Bankruptcy Court considered the various <u>Iridium</u> factors, including whether the settlement negotiations were at arm's length, the possibility of success if the Trustee were to litigate the New York Action, or on the other hand the possibility of costly and protracted litigation, and the paramount interest of BLMIS' customers and creditors.   <u>See</u> Settlement Order at 6.   Moreover, there were only three objectors to the settlement agreement, and only two—the Appellants—have appealed the Bankruptcy Court's order.   The Bankruptcy Court determined that "the Settlement falls well above the lowest point in the range of reasonableness." Settlement Order at 6.   It should also be noted that the Bankruptcy judge is highly experienced and justifiably respected.   The Bankruptcy Court did not abuse its discretion in concluding that the settlement was a reasonable one.[7]

---

[7] The Appellants also argue that the Bankruptcy court erred because it did not allow discovery in connection with the approval of the settlement.   However, discovery is not required for the approval of a settlement.   <u>See, e.g.</u>, <u>In re Chemtura Corp.</u>, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010) ("It is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying the dispute.   Rather, the court only need be apprised of those facts that are necessary to enable it

The Appellants' core arguments against the settlement,
however, concern the injunction entered by the Bankruptcy Court
in its Settlement Order.  The Appellants object in particular to
the portion of the Settlement Order that provides that:

> "[A]ny BLMIS customer or creditor of the BLMIS estate who
> filed or could have filed a claim in the liquidation . . .
> is hereby permanently enjoined from asserting any claim
> against the Picower BLMIS Accounts or the Picower Releasees
> that is duplicative or derivative of the claims brought by
> the Trustee, or which could have been brought by the
> Trustee against the Picower BLMIS Accounts or the Picower
> Releasees."

Settlement Order at 7.  The Settlement Order also noted
that "Objectors Fox and Marshall are creditors of BLMIS over
whom the Court has personal jurisdiction and against whom this
Court can issue a permanent injunction."  Id.

The Appellants' arguments in this regard track closely
their arguments against the Automatic Stay Order.  They argue
that, because the Florida Actions assert independent claims that
are not the property of the estate and that the Trustee may not
properly assert, the Bankruptcy Court lacked jurisdiction to

---

to evaluate the settlement and to make a considered and
independent judgment about the settlement.  In doing so, the
court is permitted to rely upon 'opinions of the trustee, the
parties, and their attorneys.'").  The Bankruptcy Court did not
err in concluding that, in this case, because one hundred
percent of the funds transferred from the Picower Accounts were
being returned to the BLMIS estate, no discovery was necessary
to determine whether the settlement agreement was fair and
reasonable.

permanently enjoin those claims.  These arguments have already
been discussed, and found unpersuasive, in the present case.

The Appellants argue that the permanent injunction is an
improper nondebtor release.  See Metromedia, 416 F.3d at 141-43.
However, to the extent that any party has genuinely independent
claims against the Picower defendants, those claims are not
enjoined by the permanent injunction.  Only claims that are
"duplicative or derivative" of claims that could have been or
were asserted by the Trustee are enjoined.  If, for example, the
Appellants had asserted in the Florida Actions that the Picower
defendants made specific misrepresentations to them in order to
induce their investment with BLMIS, those claims might not be
enjoined.  Cf. Johns-Manville, 517 F.3d at 55.  However, as
discussed in detail already, the claims alleged in the Florida
Actions are duplicative of claims owned by the estate, and are
not independent.  Because the estate owns these claims in the
first instance, the estate is entitled to settle them.  Mrs.
Weinberg's, 278 B.R. at 365.  Indeed, similar language enjoining
derivative, dependent claims was approved in the settlement of
the Dreier litigation.  See Dreier, 2010 WL 3835179, at *5.
Simply put, the only claims being released here are claims that
are the Trustee's to bring, or that are duplicative or
derivative of such claims.  Metromedia's bar on nonconsensual

releases of non-debtor claims does not apply here, because the claims being released belong to the BLMIS estate.

Moreover, to the extent that the injunction does constitute a nonconsensual non-debtor release, this case presents the type of "truly unusual circumstances" that would justify such a release. See Metromedia, 416 F.3d at 143. First, a finding of truly unusual circumstances under Metromedia can be made on the basis that the "estate received substantial consideration." Id. at 142 (citing Drexel Burnham, 960 F.2d at 293); accord Clain v. International Steel Group, 156 F. App'x 398, 399-400 (2d Cir. 2005) (summary order). The settlement reach in this case is the largest single recovery thus far for the BLMIS estate, totaling over 7.2 billion dollars. That substantial sum was recovered for the estate after arm's length bargaining, and the injunction of derivative claims like the Florida Actions was part of that bargain.

More broadly, the Court of Appeals has noted that the injunction must "play[] an important part in the debtor's reorganization plan." Metromedia, 416 F.3d at 141 (internal quotation marks omitted). Here, the ability of the Bankruptcy Court to issue narrowly tailored injunctions of derivative claims by individual BLMIS customers against third parties who have settled avoidance claims with the Trustee is critical to the success of the SIPA liquidation. The Trustee's ability to

recover BLMIS property through settlements would be seriously undermined if those from whom the property was sought believed that they faced double liability.  Indeed, the Trustee was required to seek this injunction as part of the settlement agreement.  Moreover, by preventing duplicative or derivative litigation, the injunction also ensures the integrity of the SIPA liquidation itself, by preventing those who are not SIPA payees under the Net Equity Decision from circumventing that decision and undermining the liquidation plan.

The availability of the $7.2 billion is itself an important component of the liquidation plan, because those funds represent the single largest source of funds for BLMIS customers.  If the injunction were stricken, it is not clear that the agreement would still bind the Picower defendants; indeed, the Picower defendants have asserted that the funds can still revert to them.  Cf. In re Johns-Manville Corp., --- F. Supp. 2d ---, Nos. 11 Civ. 1312, 11 Civ. 1329, 2012 WL 667084, at *9 (S.D.N.Y. Mar. 1, 2012) (concluding that insurer of debtor was not bound by a settlement agreement where, after appellate review struck down part of the bargain-for injunction, Travelers "did not walk away with precisely the injunction it bargained for" (internal quotation marks omitted)).[8]

---

[8] The settlement agreement in this case required the Trustee to use his reasonable efforts to obtain approval of a "Final 9019

Allowing the Florida Actions to go forward would carry real risks to the estate, implicating the viability of the current settlement and the possibility of future settlements, and providing an avenue for BLMIS customers who are displeased with the Net Equity Decision to undermine that decision by directly pursuing claims that are wholly derivative of claims already brought by the Trustee.  In a more immediate sense, it would allow two litigants who are unhappy with the order of priority for the disbursement of funds to BLMIS customers to stand between BLMIS customers who lost their principal investments in the Madoff Ponzi scheme and billions of dollars in recovery.  In short, the potential of the Florida Actions to undermine this settlement, future settlements and the underlying liquidation constitute the type of "truly unusual circumstances" that justify a release of nondebtor claims.  In any event, this is not a case in which the Bankruptcy Court has enjoined an independent lawsuit.  In this case, the enjoined claims are dependent on and identical in substance to the claims that are being settled.

In sum, the settlement agreement is fair and reasonable, and the permanent injunction that was issued in connection with the settlement agreement was a proper use of the Bankruptcy

---

Order" that "shall include" the permanent injunction about which the Appellants complain.  Settlement Agreement at 5.

Court's power under § 105(a) to protect the BLMIS estate and the Bankruptcy Court's continuing jurisdiction over this massive SIPA liquidation.  Accordingly, the Bankruptcy Court's January 13 Order is **AFFIRMED**.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

The Bankruptcy Court's Automatic Stay Order, and its Order approving the settlement between the Trustee and the Picower defendants and permanently enjoining certain duplicative or derivative actions against the Picower Defendants is **AFFIRMED.**

**This Opinion and Order finally disposes of the above captioned appeals.**

**The Clerk is directed to close these cases and to close any open motions.**

SO ORDERED.

Dated:     New York, New York
           March 26, 2012

                                    _____
                                         John G. Koeltl
                                    United States District Judge